# BUSINESS ASSOCIATE AGREEMENT

## PETTIS COUNTY, MISSOURI

**Definitions**

Catch-all definition:

The following terms used in this Agreement will have the same meaning as those terms in the HIPAA Rules (https://www.federalregister.gov/articles/2013/01/25/2013-01073/modifications-to-the-hipaaprivacy-security-enforcement-and-breach-notification-rules-under-the): Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

Specific definitions:

(a) Business Associate. "Business Associate" will generally have the same meaning as the term "Business Associate" at 45 CFR 160.103, and in reference to the party to this agreement, will mean Advanced Correctional Healthcare, Inc.

(b) Covered Entity. "Covered Entity" will generally have the same meaning as the term "Covered Entity" at 45 CFR 160.103, and in reference to the party to this agreement, will mean Pettis County Jail.

(c) HIPAA Rules. "HIPAA Rules" will mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

**Obligations and Activities of Business Associate**

Business Associate agrees to:

(a) Not use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

(b) Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

(c) Report to Covered Entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, within 48 hours (except for any breaches putting patients at immediate risk of harm, which should be reported as soon as possible) and any security incident of which it becomes aware;

(d) In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the Business Associate agree to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information;

(e) Make available protected health information in a designated record set to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.524;

1
Doe v Pettis County, et al.
Case 2:22-cv-04164-SRB   Case No. 2:22-CV-04164-SRB 12/14/22   Page 1 of 17
Document 45-5 Filed
Doc. No. 034

(f) Make any amendment(s) to protected health information in a designated record set as directed or agreed to by the Covered Entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy Covered Entity's obligations under 45 CFR 164.526;

(g) Maintain and make available the information required to provide an accounting of disclosures to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.528;

(h) To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s); and

(i) Make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

**Permitted Uses and Disclosures by Business Associate**

(a) Business Associate may only use or disclose protected health information as necessary to perform the services set forth in the Agreement for the Provision of Health Services. The Business Associate is authorized to use protected health information to de-identify the information in accordance with 45 CFR 164.514(a)-(c).

(b) Business Associate may use or disclose protected health information as required by law.

(c) Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

(d) Business Associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by Covered Entity, except for the specific uses and disclosures set forth below.

(e) Business Associate may use protected health information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(f) Business Associate may disclose protected health information for the proper management and administration of Business Associate or to carry out the legal responsibilities of the Business Associate, provided the disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(g) Business Associate may provide data aggregation services relating to the health care operations of the Covered Entity.

**Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions**

(a) Covered Entity will notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of protected health information.

2

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 035

Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 2 of 17

(b) Covered Entity will notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her protected health information, to the extent that such changes may affect Business Associate's use or disclosure of protected health information.

(c) Covered Entity will notify Business Associate of any restriction on the use or disclosure of protected health information that Covered Entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of protected health information.

**Permissible Requests by Covered Entity**

Covered Entity will not request Business Associate to use or disclose protected health information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by Covered Entity, except if the Business Associate will use or disclose protected health information for data aggregation or management and administration and legal responsibilities of the Business Associate.

**Term and Termination**

(a) <u>Term</u>. The Term of this Agreement will be effective as of the date of the last signature hereto, and will terminate on the termination of the Agreement for Health Services or the date Covered Entity terminates for cause as authorized in paragraph (b) of this Section, whichever is sooner.

(b) <u>Termination for Cause</u>. Business Associate authorizes termination of this Agreement by Covered Entity, if Covered Entity determines Business Associate has violated a material term of the Agreement and Business Associate has not cured the breach or ended the violation within the time specified by Covered Entity.

(c) <u>Obligations of Business Associate Upon Termination</u>.

Upon termination of this Agreement for any reason, Business Associate, with respect to protected health information received from Covered Entity, or created, maintained, or received by Business Associate on behalf of Covered Entity, will:

1. Retain only that protected health information which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities;

2. Return to Covered Entity or, if agreed to by Covered Entity, destroy the remaining protected health information that the Business Associate still maintains in any form;

3. Continue to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information to prevent use or disclosure of the protected health information, other than as provided for in this Section, for as long as Business Associate retains the protected health information;

4. Not use or disclose the protected health information retained by Business Associate other than for the purposes for which such protected health information was retained and subject to the same conditions set out at paragraphs (e) and (f) above under "Permitted Uses and Disclosures By Business Associate" which applied prior to termination; and

3
Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 3 of 17
Doc. No. 036

5. Return to Covered Entity [or, if agreed to by Covered Entity, destroy] the protected health information retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.

(d) <u>Survival</u>. The obligations of Business Associate under this Section will survive the termination of this Agreement.

**Miscellaneous**

(a) <u>Regulatory References</u>. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended.

(b) <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law. No amendment to this Agreement will be effective until reduced to writing and signed by the parties.

(c) <u>Interpretation</u>. Any ambiguity in this Agreement will be interpreted to permit compliance with the HIPAA Rules.

(d) <u>No Third Party Beneficiaries</u>. There are no intended third party beneficiaries to this Agreement.

(e) Without in anyway limiting the foregoing, it is the parties' specific intent that nothing contained in this Agreement give rise to any right or cause of action, contractual or otherwise, in or on behalf of any Individual whose PHI is Used or Disclosed pursuant to this Agreement.

(f) <u>Waiver</u>. No provision of this Agreement may be waived except by an agreement in writing signed by the waiving party. A waiver of any term or provision will not be construed as a waiver of any other term or provision.

(g) <u>Authority</u>. The persons signing below have the right and authority to execute this Agreement for their respective entities and no further approvals are necessary to create a binding Agreement.

(h) <u>Conflict</u>. In the event of any conflict between the terms and conditions stated within this Agreement and those contained within any other agreement or understanding between the parties, written, oral or implied, the terms of this Agreement will govern. Without limiting the foregoing, no provision of any other agreement or understanding between the parties limiting the liability of the Business Associate to Covered Entity will apply to the breach of any term, condition or covenant contained in this Agreement by Business Associate.

(i) <u>Headings</u>. The headings of each section are inserted solely for purposes of convenience and will not alter the meaning of this Agreement.

(j) <u>Governing Law</u>. This Agreement will be construed in accordance with and governed by the laws of the State of Missouri.

**IN WITNESS WHEREOF,** the parties have executed this Agreement effective upon the date of the last signature hereto.

**BUSINESS ASSOCIATE**                                    **COVERED ENTITY**

4

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 037
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 4 of 17

| ADVANCED CORRECTIONAL HEALTHCARE, INC. | PETTIS COUNTY JAIL |
|---|---|
| _____ | _Brad [signature]_____ |
| Jessica K. Young, Esq., CCHP-A<br>President & Chief Executive Officer | Sheriff |
| _____ | 9-9-22_____ |
| Date | Date |

Please complete and return via email to Contracts@advancedch.com

## AGREEMENT FOR THE PROVISION OF HEALTH CARE TO INCARCERATED PATIENTS
## PETTIS COUNTY, MISSOURI

This agreement, effective as of the date of the last signature hereto, entered into by and between the County of Pettis, located in the State of Missouri, through the Pettis County Sheriff in their official capacity (hereinafter referred to as "county"), and Advanced Correctional Healthcare, Inc. (hereinafter referred to as "ACH"), a Tennessee corporation.

### DEFINITIONS

**COUNTY PATIENTS** – Patients booked into the custody of the county and presently incarcerated in the facility, but not to include non-county patients.

**NON-COUNTY PATIENTS** – Patients who are covered by a government health program for American Indians; work release patients while on work release; patients during transport to/from outside facilities; and patients housed in the facility for other counties, State Department of Corrections, U.S. Immigration and Customs Enforcement (ICE), U.S. Marshals, and/or other federal agencies.

### ARTICLE 1:
### ACH

1.1 BIOMEDICAL WASTE DISPOSAL. The county will pay for biomedical waste disposal services at the facility. Typical biomedical waste expected in the medical unit would be bandages, dressings, gloves, hypodermic needles, laboratory containers, sharps, and syringes.

1.2 DENTAL CARE. ACH will provide dental triage screenings. The county will pay for all costs associated with dental care.

1.3 ECTOPARASITES. For patients presenting with symptoms of ectoparasitic infection (as determined by the ACH prescriber), ACH will provide medically indicated treatment. For patients without symptoms of ectoparasitic infection, ACH will provide treatment at the county's request. The

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 038
5
Case 2:22-cv-04164-SRB Document 45-5 Filed 12/14/22 Page 5 of 17

county will be responsible for the cost of the treatment. ACH will not be responsible for facility cleaning for ectoparasites.

1.4 ELECTIVE CARE. Elective care is defined as care which, if not provided, would not, in the opinion of ACH's prescriber, cause the patient's health to deteriorate. ACH will not pay for elective care for patients.

1.5 LABOR. Incarcerated patients will not be employed or otherwise utilized by ACH.

1.6 MEDICAL CLAIMS RE-PRICING. Upon the county's request, ACH will re-price medical claims through our third-party vendor, JAB Management Services. Once claims are received, JAB will calculate the applicable discount (if any) and confirm the integrity of the claim prior to returning to the county for payment. JAB averages a claims processing standard of 40 days; however, we anticipate being able to process the county's claims within a maximum of 28 days. The monthly amount to be paid by the county to ACH for this service is to be 15% of the savings on the medical claim(s). (For example, if JAB re-prices a $100 claim down to $20, ACH will charge the county 15% of the $80 JAB saved the county – $12.) The county agrees to pay ACH within 30 days of receipt of the bill. If the invoice is not paid within 30 days, the county agrees to pay a 1.5% per month finance charge.

1.7 MEDICAL SUPPLIES (DISPOSABLE). The county will pay for disposable medical supplies intended for one-time use, not to include durable or reusable medical supplies. Typical disposable medical supplies expected in a medical unit would be alcohol preps, ammonia ampules, bandages, blood sugar strips, cotton-tip applicators, gauze pads, gloves, lancets, med cups, medical tape, O2 tubing, peak flow mouth pieces, PPE (personal protective equipment), pregnancy tests, saline, sterile water, syringes, tongue blades, and urine test strips.

1.8 MENTAL HEALTH FIRST AID (MHFA) TRAINING. Mental Health First Aid is an 8-hour course that teaches you how to identify, understand and respond to signs of mental illnesses and substance use disorders. The training gives you the skills you need to reach out and provide initial help and support to someone who may be developing a mental health or substance use problem or experiencing a crisis. ACH provides MHFA training free to your officers.

1.9 MOBILE SERVICES. Mobile services are defined as laboratory services that are drawn on-site and sent off-site for testing, and any ancillary medical services in which a provider comes on-site to perform work using the provider's equipment and/or staff, including, but not limited to X-ray services. The county will pay for all costs associated with mobile services.

1.10 MORTALITY AND MORBIDITY REVIEW. The County acknowledges (a) that it is the responsibility of the County to obtain a review of any death in the facility (as appropriate) pursuant to any applicable statutes (if any), such as Minn. Stat. 241.021 (or any similar act or amendment of that act), (b) that ACH cannot perform such reviews for a facility where it provides medical services, and (c) that the cost of such reviews will be borne by the County.

1.11 OFFICER WELLNESS & CRITICAL INCIDENT EMPLOYEE RAPID RESPONSE (CIERR). The CIERR program is a free staff support service. This program helps to support law enforcement (field and facility), first responders, and health care professionals and mitigate stress reactions in both personal and professional capacities. Contact with CIERR can be initiated by the professional in need of services or Freedom Behavioral Health, Inc. can initiate contact with notification from

6
Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 6 of 17
Doc. No. 039

leadership within the department that the individual would benefit from the services. Unless there are safety concerns, the contacts are treated as confidential.

1.12 OFF-SITE SERVICES. Off-site services are defined as medical services including, but not limited to, consultation services, dental care not performed on-site, diagnostic testing (including but not limited to covid testing), hospital services, medically-indicated emergency ground ambulance transportation, mental health services not performed on-site, laboratory services that are drawn offsite, and specialty services. It is the policy of ACH to provide our health care professionals the freedom to provide care without limitation by approval process for outside care, etc. Each situation should be addressed on a case-by-case basis. ACH does not have standing orders. The county will pay for any costs associated with off-site services.

1.13 OTHER SERVICES AND EXPENSES. ACH may not provide and will not pay for any services, supplies and/or equipment which are not specifically contained in this agreement.

1.14 PHARMACEUTICALS. The county will pay for pharmaceuticals. The county agrees to allow home medications in the facility when they are able to be properly verified. It is the policy of ACH to provide our health care professionals the freedom to provide care without limitation by prescription formulary, corporate approval for expensive medication, etc. Each situation should be addressed on a case-by-case basis. ACH does not have standing orders. ACH does not have a formulary.

1.15 STAFFING.

    1.15.1 CANCELATIONS. If the county cancels a worker with less than 24 hours' notice prior to the start of the worker's shift, then the county agrees to pay for the worker's shift.

    1.15.2 MEAL BREAKS. It is understood and agreed that during unpaid meal break(s), ACH employees are (1) allowed to leave their duty post and (2) completely relieved from all duties. If the facility requires the ACH employee to be "on call" during meal break(s) so that they may respond to an emergency, then the ACH employee is considered to be "on duty" and the meal break(s) will be paid for by the county.

    1.15.3 MEDICAL PRESCRIBER. A prescriber will visit the facility weekly (or as otherwise agreed by the county and ACH) and will stay until their work is completed. A prescriber will be available by telephone to the facility and health care teams on an on-call basis, 7 days per week, 24 hours per day, 365 days a year. For onsite visits that fall on holidays, paid time off, or sick time, ACH endeavors to provide replacement onsite coverage, and if it is unable to do so, ACH and the county will negotiate a mutually agreeable remedy (such as crediting back 75% of the wages of the particular employee) (the other 25% pays for telephone on-call).

    1.15.4 NURSING. ACH will provide on-site nursing coverage for 40 hours per week on a schedule approved by the county. ACH does not and will not put nurses on-call. The county agrees to pay, on a monthly basis, for extra hours worked (at the prevailing wage and benefit rate of the particular employee). For hours of absence due to holidays, paid time off, or sick time, the hours will not be replaced or credited (because the employee is still being paid for the time off). For other absences, ACH endeavors to provide replacement coverage, and if it is unable to do so, ACH and the county or designee will negotiate a mutually agreeable remedy (such as crediting back the wages of the particular employee).

7
Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 040
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 7 of 17

1.15.5 QUALIFIED MENTAL HEALTH PROFESSIONAL (QMHP). ACH will provide an on-site QMHP for 6 hours per week on a schedule approved by the county. The county agrees to pay, on a monthly basis, for extra hours worked (at the prevailing wage and benefit rate of the particular employee). For hours of absence due to holidays, paid time off, or sick time, the hours will not be replaced or credited (because the employee is still being paid for the time off). For other absences, ACH endeavors to provide replacement coverage, and if it is unable to do so, ACH and the county or designee will negotiate a mutually agreeable remedy (such as crediting back the wages of the particular employee).

    1.15.5.1 ON-CALL QUALIFIED MENTAL HEALTH PROFESSIONAL (QMHP). Upon the facility's request, ACH will provide a QMHP at the rate of $150 per hour (with a minimum of 1 hour per visit). Services may be provided in-person or via tele-health (as mutually agreed upon). QMHP responsiveness will depend upon the amount of notice given, and the mutually agreed upon schedule.

1.15.6 TELEHEALTH. When agreed to between the county and ACH, providers may deliver patient care via telehealth.

1.16 TUBERCULOSIS (TB) TESTING. ACH will perform TB skin tests as directed by the county. The county will pay for the TB serum and related supplies. Upon the county's request, ACH will secure the serum and related supplies through the correctional pharmacy, then bill the county for those costs, and the county agrees to pay.

## ARTICLE 2: THE COUNTY

2.1 AUTOMATED EXTERNAL DEFIBRILLATORS (AEDs). The duty to purchase, provide, inspect, and maintain the facility's AEDs is, and always will be, vested in the county. This agreement does not result in the assumption of those duties by ACH or its people. While ACH and its people may assist the county, ultimately the county specifically retains the duties and obligations with respect to AEDs. ACH and its people will assume no responsibility for and will not be liable for the facility's lack of AED(s) and/or defective and/or non-working AEDs in the facility.

2.2 CO-PAY. The county agrees to the use of a co-pay system, as permitted by law, for patient medical requests. The county will be responsible for determining the legality and structure of the co-pay system. **Patients will be seen by the health care team regardless of their ability to pay.**

2.3 COUNTY'S ILLNESS REPORTS, POLICIES, PROCEDURES. All illness reports, policies, and procedures will at all times remain the property of the county and will remain at the facility. ACH may make recommendations to the county's health care policies, procedures, and illness reports. Those recommendations are made for the county's consideration. ACH operates within the county's policies, procedures, and illness reports. It is the policy of ACH to provide our health care professionals the freedom to provide care without limitation by prescription formulary, approval process for outside care, etc. The materials in this section are for general information purposes only. That information should be treated as guidelines, not rules. The information is not intended to establish a standard of medical care and is not a substitute for common sense. The information is <u>not</u> legal advice, is not to be acted on as such, may not be current, and is subject to change without

8

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 041

Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 8 of 17

notice. Each situation should be addressed on a case-by-case basis. ACH does not have standing orders. ACH does not have a formulary.

2.4 CPR CARDS. ACH will not pay for CPR cards for county employees.

2.5 DUTY TO PROTECT PATIENTS. The non-delegable duty to protect patients is, and always will be, vested in the county. This agreement does not result in the assumption of a non-delegable duty by ACH. As such, the county specifically retains the duty and obligation for security of the patients. This duty extends to the control of patient movement. ACH and its personnel will assume no responsibility for the movement of patients and assume no responsibility for patient protection at any time.

2.6 ELECTRONIC COMMUNICATIONS. The county agrees to provide to ACH copies of any electronic communications between ACH and ACH's employees and independent contractors in the county's possession (including stored on the county's email servers) as requested by ACH. The county agrees to treat electronic communications between ACH and its employees and independent contractors as confidential and agrees not to share those communications with any third party unless required by law.

2.7 EMPLOYEE RAIDING (ANTI-POACHING / NON-SOLICITATION AGREEMENT). ACH makes a significant investment in the training and professional development of our employees and independent contractors. As a result, ACH does not expect the county to offer employment to or otherwise "poach" or solicit ACH employees or independent contractors **and the county is specifically prohibited from doing the same**. If the county should hire any ACH employee or independent contractor during this agreement's term or within 1 year after this agreement's termination, the county agrees to pay ACH a professional replacement fee of $10,000 or 10% of this contract price, whichever is greater, for each employee or independent contractor, with the following exception: this does not apply to any person who was employed by the county prior to this agreement. It is expressly agreed by ACH and the county that the payment under this provision does not constitute a penalty and that the parties, having negotiated in good faith and having agreed that the payment is a reasonable estimate of damages in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such payment.

2.8 MEDICAL AND MENTAL HEALTH RECORDS. Patient medical and mental health records will always be the property of the county and will remain in the facility. The county agrees to provide copies of those records to ACH when requested.

2.9 MEDICAL EQUIPMENT (DURABLE). The county pays for medical equipment. At the county's request, ACH will assist the county in securing the equipment at cost-effective pricing. Typical durable medical equipment expected in a medical unit would be: exam table, exam stool, ophthalmic / otoscope, peak flow meter, digital thermometer, stethoscope, X-large and large blood pressure cuffs, refrigerator (small), and scales. Medical equipment will be the property of the county.

2.10 NON-MEDICAL CARE OF PATIENTS. The county will provide and pay for non-medical needs of the patients while in the facility, including, but not limited to: daily housekeeping services; dietary services, including special supplements, liquid diets, or other dietary needs; building maintenance services; personal hygiene supplies and services; clothing; and linen supplies.

9

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 9 of 17
Doc. No. 042

2.11 NURSING LICENSURE. ACH's preference is to run a health care program using RNs. Ultimately, the level of nursing licensure ACH provides at the facility is the county's decision (RN vs. LPN). ACH does not and will not put nurses on-call.

2.12 OFFICE EQUIPMENT (DURABLE). The county will provide use of county-owned office equipment and utilities in place at the facility's health care unit. Typical office equipment expected in a medical unit would be a locking file (recommended four-drawer); paper punch; staple remover; stapler; cabinet for storing medical supplies such as Band-Aids, gauze, etc.; computer; fax machine; copier / printer; and toner. Upon termination of this agreement, the office equipment will be in good working order, with allowances made for reasonable wear and tear.

2.13 OFFICE SUPPLIES (DISPOSABLE). The county will provide disposable office supplies, such as medical charts, paper, pens, staples, and Post-It notes which are required for the provision of patient health care services.

2.14 OFFICER TRAINING. The duty to train the officer(s) is and always remains vested in the county. Upon request of the county, ACH may assist in training for officer(s) on certain topics as determined by the county. The county is solely responsible for overall operation of the facility, including medical care. The county maintains ultimate responsibility for training and supervising its correctional officers, including but not limited to emergency procedures, ensuring sick calls are passed along to the medical team, and properly distributing medications (where appropriate).

2.15 PREVENTATIVE SERVICES. If the county requests preventative services (such as flu shots, covid vaccinations, etc.) for incarcerated patients or county employees, the county will pay for it.

ACH may provide, but will not pay for, preventative services. Upon the county's request, ACH will secure the vaccination (for example) and related supplies (if applicable) through the correctional pharmacy or health department, then bill the county for any costs, and the county agrees to pay.

2.16 RECRUITING.

2.16.1 DECLINING APPLICANTS FROM ACH SO THE COUNTY MAY EMPLOY THEM DIRECTLY. ACH makes a significant investment in the recruiting of new applicants and acknowledges the county has final approval of who may enter the facility. As a result, ACH does not expect the county to deny approval of an applicant presented to them in order for the county to employ that person directly. If, during the term of this agreement or within 1 year after this agreement's termination, the county should hire an applicant who was presented to them by ACH and denied approval by the county, the county agrees to pay ACH 30% of the applicant's first year's salary/compensation as a recruiting fee for each applicant.

2.16.2 DECLINING TO FILL A POSITION AFTER ACH INCURS ADVERTISING AND RECRUITING COSTS. ACH makes a significant investment in the advertising and recruiting of new applicants and acknowledges the county has final approval of the staffing level at the facility. As a result, ACH does not expect the county to decline to fill a position after ACH has incurred advertising and recruiting costs. If, during the term of this agreement, ACH should begin advertising and recruiting for a position(s), and the county

10

Doe v Pettis County, et al.
Case 2:22-cv-04164-SRB  Case No. 2:22-CV-04164-SRB  Filed 12/14/22  Page 10 of 17
Doc. No. 043

subsequently decides not to fill that position(s), the county agrees to pay ACH the actual costs of advertising and recruiting plus 30%.

2.17 SECURITY. The county will maintain responsibility for the physical security of the facility and the continuing security of the patients. The county understands that adequate security services are necessary for the safety of the agents, employees, and subcontractors of ACH, as well as for the security of patients and officer(s), consistent with the correctional setting. The county will provide security sufficient to enable ACH and its personnel to safely provide the health care services described in this agreement. The county will screen ACH's proposed staff to ensure that they will not constitute a security risk. The county will have final approval of ACH's employees and independent contractors regarding security/background clearance. Should the facility unreasonably withhold security clearance and/or withhold security clearance on an unreasonably high quantity of proposed staff, it places an excessive burden on ACH to staff the facility. In that case, ACH may hire Agency worker(s) to temporarily staff the facility, and the county agrees to pay the difference between the Agency rate(s) and ACH rate(s).

### ARTICLE 3:
### COMPENSATION/ADJUSTMENTS

3.1 ANNUAL AMOUNT/MONTHLY PAYMENTS. The county agrees to pay $285,603.70 per year to ACH under this agreement. To do so, the county agrees to make monthly payments of $23,800.31 to ACH during the term of this agreement. ACH will bill the county approximately 30 days prior to the month in which services are to be rendered. The county agrees to pay ACH within 30 days of receipt of the bill. If the invoice is not paid within 30 days, the county agrees to pay a 1.5% per month finance charge.

   3.1.1 ELECTRONIC PAYMENTS. The county agrees to pay ACH electronically through the Automated Clearing House. If the county does not want to pay electronically, then the

   county agrees to pay an additional 2% per month charge. If the county believes it is statutorily exempt, please provide the statute citation.

   3.1.2 **FIRST PAYMENT. The county asked, and ACH has agreed, to defer payment for the months of October 2022, November 2022, December 2022, and January 2023 until January 1, 2023. On or about January 1, 2023, the county understands and agrees it will be billed for October 2022, November 2022, December 2022, January 2023, and February 2023 – and the county agrees to pay these amounts in full and in one lump sum payment prior to February 1, 2023 (~$119,001.55 +/- any reconciliations). On or about February 1, 2023, the county will begin regular monthly billing (starting with March 2023's invoice).**

   3.1.3 ANNUAL AMOUNT UPON RENEWAL. Upon the annual anniversary of the commencement of services under this agreement, the annualized amount of increase for compensation and per diem rates (and any other contracted rates, including the on-call QMHP rate, for example) will be the rolling 12-month Consumer Price Index (CPI) for Hospital and related services (Series Id CUUR0000SEMD) or 5%, whichever is higher.

11

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 11 of 17
Doc. No. 044

3.2 FUNDING THE FACILITY'S HEALTH CARE PROGRAM. It is ultimately the responsibility of the county to appropriately fund the facility's health care program. As a result, ACH's health care program at the facility (staffing, etc.) is customized and approved by the county.

3.3 QUARTERLY ADJUSTMENTS.

3.3.1 AVERAGE DAILY POPULATION (ADP). ADP for a given quarter will be determined from the facility census records. For billing purposes, the county patient ADP will be 160 and the non-county patient ADP will be 0. Patients who are not presently incarcerated in the facility (i.e., persons on electronic monitoring or probation, or who are hospitalized, or in halfway housing or early release housing) should not be counted in either ADP reported to ACH by the county. The ADPs reported to ACH should only include those patients presently incarcerated in the facility.

3.3.2 PER DIEM. When the ADP exceeds or falls below the contracted rate in any calendar quarter, the compensation variance will be figured on the average number of patients above or below the contracted ADP for that quarter multiplied by the per diem rate of $0.43 per patient per day. (Example: If the ADP for a quarter is 10 above the contracted ADP, additional compensation due will be calculated as follows: 10 x $0.43 x 91)

3.3.3 RECONCILIATION. Any contract amount in arrears (or amount to be credited back to the county) will be settled through reconciliation on the first monthly invoice prepared after reconciliation. No credits will be issued after 90 days.

## ARTICLE 4:
## TERM AND TERMINATION

4.1 TERM. The term of this agreement will begin on October 1, 2022 at 12:01 A.M. and will continue in full force and effect until September 30, 2025 at 11:59 P.M., unless earlier terminated, extended, or renewed pursuant to this agreement. This agreement will automatically renew for successive 3year periods unless either party gives 30 days' written notice prior to the end of a term.

4.2 TERMINATION.

4.2.1 TERMINATION FOR LACK OF APPROPRIATIONS. It is understood and agreed that this agreement will be subject to annual appropriations by the county. If funds are not appropriated for this agreement, then upon exhaustion of such funding, the county will be entitled to immediately terminate this agreement. Recognizing that such termination may entail substantial costs for ACH, the county will act in good faith and make every effort to give ACH reasonable advance notice of any potential problem with funding or appropriations. The county agrees to pay for services rendered up to the point of termination.

4.2.2 30-DAY OUT CLAUSE. Notwithstanding anything to the contrary contained in this agreement, the county or ACH may, without prejudice to any other rights they may have, terminate this agreement by giving 30 days' advance written notice to the other party. If the county gives ACH less than 30 days' advance written notice, the county agrees to pay to ACH 1-month's contract price as an early termination fee.

12

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 045

Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 12 of 17

## ARTICLE 5:
## GENERAL TERMS AND CONDITIONS

5.1 ADVICE OF COUNSEL. Each of the parties (a) has had the opportunity to seek counsel, legal or otherwise, prior to entering into this agreement, (b) is freely entering into this agreement of his/her or its own volition, and (c) understands and agrees that this agreement will be construed as if drafted by both parties and not by one party solely.

5.2 AUTHORITY. The persons signing below represent that they have the right and authority to execute this agreement for their respective entities and no further approvals are necessary to create a binding agreement.

5.3 COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAWS. The county and ACH agree that no party will require performance of any ACH or county employee, agent or independent contractor that would violate federal, state and/or local laws, ordinances, rules and/or regulations. If the county elects not to follow any federal, state, or local law, the parties agree the county will be responsible for all costs associated with noncompliance. The county will be responsible for any additional services required at the facility as the result of governmental (including, but not limited to, Centers for Disease Control and Prevention, Department of Justice, health department, Immigration and Customs Enforcement, Department of Corrections, Federal Bureau of Prisons, or United States Marshals Service) investigation, mandate, memorandum, or order. Should ACH be asked to provide substantial new medical treatment, the county will pay for it, unless specifically agreed upon in writing between ACH and the county.

5.4 COUNTERPARTS; HEADINGS. This agreement may be executed in counterparts, each of which will be an original and all of which will constitute one agreement. The headings contained in this agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this agreement. The term "patient" includes incarcerated detainees and inmates.

5.5 ENTIRE AGREEMENT; AMENDMENT. This agreement represents the entire understanding of the parties with respect to the subject matter hereof, supersedes and cancels all prior agreements, understandings, arrangements, or representations between the parties with respect to such subject matter, and may only be amended by written agreement of both parties. The parties agree that their performances hereunder do not obligate either party to enter into any further agreement or business arrangement.

5.6 EQUAL EMPLOYMENT OPPORTUNITY. It is the policy of ACH to provide equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, sex, national origin, disability, age, or genetics. This policy applies to all terms and conditions of employment including, but not limited to, recruitment, hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, benefit plans, all forms of compensation, and training.

5.7 EXCUSED PERFORMANCE. In case performance of any terms or parts hereof will be delayed or prevented because of compliance with any law, decree, or order of any governmental agency or authority of local, state, or federal governments or because of riots, public disturbances, strikes, lockouts, differences with workers, fires, floods, Acts of God, pandemics, or any other reason whatsoever which is not within the control of the parties whose performance is interfered with and which, by the exercise of reasonable diligence, said party is unable to prevent, the party so suffering

13
Doe v Pettis County, et al.
Case 2:22-cv-04164-SRB   Case No. 2:22-CV-04164-SRB   Page 13 of 17
Document 45-5-1 Filed 12/14/22
Doc. No. 046

may at its option, suspend, without liability, the performance of its obligations hereunder during the period such cause continues.

5.8 FILMING. ACH does not consent to the filming of its employees for any commercial purpose including, but not limited to, documentaries, docuseries (including, but not limited to, "60 Days In"), etcetera. If the facility and/or county decide to engage in such a project, they agree to notify ACH's legal department at least 90 days prior to filming, at 309-692-8100; facsimile: 309-2149977; or email: Contracts@advancedch.com. ACH reserves the right to terminate the agreement prior to the beginning of the filming of such a project. ACH will have no obligation under this agreement to maintain insurance coverage against any loss or damage caused or necessitated by the filming of such a project. The county agrees to hold harmless and indemnify ACH and its employees against any loss or damage, including reasonable attorneys' fees and other costs of litigation, caused or necessitated by the filming of such a project.

5.9 FURTHER ACTS. The parties agree to perform any further acts and execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this agreement.

5.10 GOVERNING LAW. This agreement will be governed by the laws of the State of Missouri (without reference to conflicts of laws principles).

5.11 INDEPENDENT CONTRACTORS. ACH may engage certain health care professionals as independent contractors rather than employees. The county understands and acknowledges that some physicians, advanced practice providers, nurses, mental health workers, consultants, specialists, and other allied health professionals practicing with ACH ("health care team members") are not employees or associates of ACH; and that ACH is not responsible for their opinions, decisions or medical procedures performed.

5.12 INTERGOVERNMENTAL AGREEMENTS (IGAs) (PIGGYBACK). ACH agrees to allow the county to authorize other government agencies to purchase the proposed items by issuance of a purchase order at the same terms and conditions as this agreement, and to make payments directly to ACH during the period of time that this agreement is in effect.

5.13 NO GRANT OF RIGHTS. Each of the parties understands and agrees that no grant or license of a party's rights in any patent, trademark, trade secret, copyright and/or other intellectual property right is made hereby, expressly or by implication.

5.14 NO RELATIONSHIP OR AUTHORITY. The parties agree that ACH will at all times be an independent contractor in the performance of the services hereunder, and that nothing in this agreement will be construed as or have the effect of constituting any relationship of employer/employee, partnership, or joint venture between the county and ACH. ACH does not have the power or authority to bind the county or to assume or create any obligation or responsibility on the county's behalf or in the county's name, except as otherwise explicitly detailed in this agreement, and ACH will not represent to any person or entity that ACH has such power or authority. ACH will not act as an agent nor will ACH be deemed to be an employee of the county for the purposes of any employee benefit program.

5.15 NOTICE. Any notice required or permitted to be given hereunder will be in writing and delivered to the respective addresses in this section or such other addresses as may be designated in writing by the applicable party from time to time and will be deemed to have been given when sent. To the county: Pettis County Jail, 319 S. Lamine, Sedalia, MO 65301; andersb@pettiscomo.com;

14
Doe v Pettis County, et al.
Case 2:22-cv-04164-SRB   Document 45-1   Filed 12/14/22   Page 14 of 17
Case No. 2:22-CV-04164-SRB
Doc. No. 047

viebrocks@pettiscomo.com. To ACH: Advanced Correctional Healthcare, Inc., Attn: Legal, 720 Cool Springs Blvd., Suite 100, Franklin, TN 37067; facsimile: 309.214.9977; email: Contracts@advancedch.com.

5.16 OTHER CONTRACTS AND THIRD PARTY BENEFICIARIES. The parties acknowledge that ACH is not bound by or aware of any other existing contracts to which the county is a party and which relate to the provision of health care to patients at the facility. The parties agree that they have not entered into this agreement for the benefit of any third person(s) and it is their express intention that this agreement is intended to be for their respective benefits only and not for the benefits of others who might otherwise be deemed to constitute third party beneficiaries thereof.

5.17 SEVERABILITY. If any provision of this agreement, or any portion thereof, is found to be invalid, unlawful, or unenforceable to any extent, such provision will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this agreement will continue unaffected in full force and effect. The parties will negotiate in good faith an enforceable substitute provision for such invalid provision that most nearly achieves the same intent and economic effect.

5.18 SUBCONTRACTING. ACH may subcontract services including, but not limited to, biomedical waste disposal, electronic medical records, mobile services, pharmaceutical services, staffing, and training. For example, ACH subcontracts staffing to USA Medical & Psychological Staffing, LLC; behavioral health care to Freedom Behavioral Health, S.C.; EMR to Advanced Inmate Medical Management, LLC; and training to Spark Training, LLC.

5.19 TRAINING MATERIAL. Information in any training material should be treated as guidelines, not rules. The information presented is not intended to establish a standard of medical care and is not a substitute for common sense. The information presented is not legal advice, is not to be acted on as such, may not be current, and is subject to change without notice. Each situation should be addressed on a case-by-case basis.

5.20 WAIVER. Any waiver of the provisions of this agreement or of a party's rights or remedies under this agreement must be in writing to be effective. Failure, neglect, or delay by a party to enforce the provisions hereof or its rights or remedies at any time, will not be construed as a waiver of such party's rights or remedies hereunder and will not in any way affect the validity of this agreement or prejudice such party's right to take subsequent action.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the date and year written below.

**ADVANCED CORRECTIONAL HEALTHCARE, INC.**

_____                                              _____

Jessica K. Young, Esq., CCHP-A                                           Date
President & Chief Executive Officer

**COUNTY OF PETTIS, MISSOURI**

15

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 048
Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 15 of 17

_____  September 9, 2022
Signature                                      Date

_____  September 9, 2022
Signature                                      Date

_____  September 9, 2022
Signature                                      Date

Please complete and return via email to Contracts@advancedch.com.

If this contract is not returned to ACH by 10/7/2022, the price will increase.

16

Doe v Pettis County, et al.
Case 2:22-cv-04164-SRB   Case No. 2:22-CV-04164-SRB   Filed 12/14/22   Page 16 of 17
Doc. No. 049

Doe v Pettis County, et al.
Case No. 2:22-CV-04164-SRB
Doc. No. 050

Case 2:22-cv-04164-SRB   Document 45-5   Filed 12/14/22   Page 17 of 17